# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## SOUTHERN DIVISION
## LONDON

**CRIMINAL ACTION NO. 6:25-CR-012-REW**

**UNITED STATES OF AMERICA**                                                 **PLAINTIFF**

**V.**                    **GOVERNMENT'S SENTENCING MEMORANDUM**

**CHARLES NNAMDI EMESIM**                                          **DEFENDANT**

\* \* \* \* \*

The Defendant facilitated the victimization of more than twenty senior citizens, business entities, and others by laundering more than $700,000 defrauded out of these victims over the course of more than a decade. The Presentence Investigative Report ("PSR") properly calculates Emesim's advisory U.S.S.G range as 108 to 135 months.[1] [PSR at ¶ 61.]  For the reasons set forth below, the United States advocates for a within-Guidelines custodial sentence, which would be sufficient, but not greater than necessary, to address the factors set forth in 18 U.S.C. § 3553(a). Further, the United States respectfully asks the Court to determine that the Defendant owes $1,592,315.00 in restitution, which includes the amount of funds Emesim personally laundered, as well as additional loss incurred by the victims of Emesim's conspiracy, but transferred to other

---

[1] The United States has submitted a separate memorandum addressing Emesim's unresolved objections to the PSR.

1

members of the conspiracy.

### I.      The Applicable Advisory Guidelines Range

The advisory Guidelines range serves as the "starting point and initial benchmark" for the Court's sentencing analysis. *United States v. Bolds*, 511 F.3d 568, 579-80 (6th Cir. 2007) (citation omitted). Accordingly, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines Range." *United States v. King*, 553 F. App'x 518, 520 (6th Cir. 2014) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).

The Presentence Investigative Report ("PSR") correctly calculated an offense level of thirty-one (31), comprised of a seven (7)-point base offense level, a fourteen (14)-level increase for a loss amount exceeding $550,000[2], a four (4)-level increase for substantial financial hardship to five or more victims, a two (2)-level enhancement for the defendant misrepresenting that he was acting on behalf of a government agency[3], a two (2)-level increase for the offense involving sophisticated means or for a substantial part of the offense being committed from outside the United States, and a two (2)-level increase for conviction under 18 U.S.C. § 1956. *See* U.S.S.G. §§ 2S1.1(a)(1) and (b)(2)(B); 2B1.1(b)(1)(H), (b)(2)(B), (b)(9)(A), (b)(10)(B), and (b)(10)(C). [PSR at ¶¶ 25-31.] Then, the PSR increased the offense level by two levels because the defendant knew or should have known that the victim of the offense was a vulnerable victim. *See* U.S.S.G. §

---

[2] Because the Victim Declarations of Loss added $400,000 to the requested restitution amount after the Plea Agreement was negotiated, the United States continues to advocate for the 14-level increase, as stated in the Plea Agreement.

[3] The Defendant objects to this enhancement.  This objection should be overruled for the reasons set forth in the United States's memorandum on the unresolved objections, filed simultaneous hereto.

3A1.1(b)(1). [*Id.* at ¶ 31.] Finally, the PSR properly awarded the Defendant with a two (2)-point reduction for acceptance of responsibility.  *See* U.S.S.G. § 3E1.1(a). [*Id.* at ¶ 37.] With the PSR's total offense level of thirty-one (31) and a criminal history falling in Category I, Emesim's properly calculated, advisory Guidelines range is 108 to 135 months' imprisonment. [*Id.* at ¶¶ 38, 61.]

**II.    A Guideline Sentence is Appropriate Under 18 U.S.C. § 3553(a)**

While the advisory Guidelines range serves as the "starting point and initial benchmark" for the Court's sentencing analysis, *Bolds*, 511 F.3d 579-80, the Court must also consider the factors set forth in 18 U.S.C. § 3553(a). These include the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, and the need to avoid unwarranted sentencing disparities between similarly situated defendants. *See* 18 U.S.C. § 3553(a)(1)-(3), (6). When fashioning the appropriate sentence, the Court endeavors to find a punishment that is "sufficient, but not greater than necessary" to address these considerations. 18 U.S.C. § 3553(a).

In achieving this task, district courts consider the Sentencing Guidelines *together* with the statutory factors set forth in § 3553(a). *See United States v. Booker*, 543 U.S. 220, 246 (2005). This is because the Guidelines "reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). The Guidelines therefore "seek

to embody the § 3553(a) considerations, both in principal and in practice." *United States v. Haj-Hamed*, 549 F.3d 1020, 1027 (6th Cir. 2008) (*quoting Rita*, 552 U.S. at 350).

*Nature and circumstances of the offense*. The Defendant engaged in a years long scheme to receive and launder the proceeds of different internet- and telephone-enabled scams. S.H. (Victim 1 in the Plea Agreement) fell prey to a romance and government imposter scam. [*See* R. 89: Plea Agreement at ¶ 3.] Others similarly fell victim to romance and imposter scams, while additional victims were defrauded by lottery scams, investment scams, inheritance scams, and medical expense scams. [*See* PSR at ¶ 15.]

The Defendant enabled his coconspirators to successfully engage in this fraudulent conduct by offering a seemingly legitimate home for their proceeds; he perpetuated this conduct by impersonating Agent Samuel Rock, who was involved in defrauding S.H. and many others, such as B.E. and G.S. The meeting with S.H. was audacious; Emesim met with her in person at the Lexington airport, when he not only asked her to sign fraudulent customs documents, but also got into her vehicle, drove with her to Walmart, had her buy him a laptop and give him additional money, and then return him to the airport.

As the Victim Impact Statements and Victim Declarations of Loss attest, Emesim's scheme caused significant financial and emotional harm. Some of the impacts are summarized as follows:

1) Victim A.W., a 68-year-old widower, described her situation as "a nightmare" that caused feelings of "overwhelming shock and abandonment." She did not tell her family about her substantial loss due to an investment scheme [*see* PSR at ¶

4

15,] "because it was shameful and humiliat[ing]." She described being depressed, drinking alcohol to forget about it, and becoming suicidal.

2) Victim C.B., also in her sixties, likewise described her situation as humiliating and traumatizing, when she was defrauded into sending $19,000 to Emesim [PSR at ¶ 15.], under the false belief that she was helping a friend she met online and his children.

3) Victim B.E. was in her sixties when she fell for an African lottery scam. [*Id.*] She explained that she borrowed money from friends, family, and even a bank to keep up with the demands of her perpetrators.  She describes the impact as "a terrible thing in my life" as she "no longer trust[s] people and no longer ha[s] the ability to handle [her] own money."

4) Victim F.C. sent approximately $8,550 to Emesim in furtherance of an investment fraud scheme. [*Id.*]  She described being "bombarded with people claiming to be from the FBI, CEO of different banks, and it goes on and on." She believes she lost hundreds of thousands in total, which resulted in her losing her home to bankruptcy as she used her mortgage money to pay the scammers.

5) J.L. explained that he lost approximately $300,000 in attempts to receive a large inheritance he planned to use "to build a new church and school."  As a result, he was forced to "return[] from retirement," but his "trust in the perpetrators led [him] to distance [him]self from family and friends, resulting in significant emotional distress and isolation." J.L. further explained that he feels

5

"embarrassed, ashamed and still after so many months and years[, and] . . . deflated and broken." He also mentioned that the "reputational damage seems to be one of the strongest effects of this experience for" him.

6) T.B.B., on behalf of her deceased father, I.B., submitted a victim impact statement describing her father as once "the most published CPA and lawyer in the world," but later suffered from dementia and declining health that left him vulnerable to "deceit and manipulation" that caused "chaos and heartbreak."

The advisory Guidelines range, which includes the agreed-upon loss amount range and enhancement for the substantial financial harm caused to at least five victims, adequately reflects the nature and circumstances of the offense.

***History and characteristics of the defendant***. There is nothing in Emesim's background that mitigates the offense conduct. He reports being reared by both parents until his father's death when he was a teenager, and that his mother was able to provide for the family.  [PSR at ¶ 48.]  Emesim has an employment record demonstrating that he is capable of earning an honest living. [*Id*. at ¶¶ 56-57.]  The Guidelines range accounts for acceptance of responsibility and his lack of prior criminal history. [*Id*. at ¶¶ 37, 40-47.] Thus, the advisory Guidelines range appropriately accounts for Emesim's history and characteristics.

***Seriousness of the offense, respect for the law, and deterrence***.  The seriousness of the offense, the need to promote respect for the law, and the need for deterrence are also important factors in this case.  *See* 18 U.S.C. § 3553(a)(2).  As noted, the offense conduct

6

– contributing to the fraud perpetrated on more than 20 victims resulting in actual losses exceeding $700,000 to Emesim's bank accounts alone – is undoubtedly serious. Without individuals like Emesim willing to participate in this type of scheme, fraudsters would find their ability to victimize American senior citizens infinitely more challenging, because having someone in the U.S. with business bank accounts lends legitimacy to the transactions induced out of the victims. Emesim's conduct as a money launderer, compounded by his impersonation of a government official when meeting in person with one of these senior citizens, getting into her vehicle, and asking her to purchase him a laptop, caused significant harm. As a result, a significant punishment is needed to reflect the seriousness of the offense and promote respect for the law.

General deterrence is also a vital consideration in this case. The lure of profits with little effort makes money laundering attractive, and the willful blindness to the impact of the crime enabled by distance from the victims makes money laundering more palatable to the offender. This sentence must deter others similarly situated to the Defendant. The United States respectfully submits that a within-Guidelines sentence also accomplishes this objective.

***Avoiding unwarranted sentencing disparities***. A meaningful term of imprisonment is also necessary to avoid unwarranted sentencing disparities. According to data from the United States Sentencing Commission, during the last five fiscal years for which data is available, there were only 98 defendants sentenced under § 2S1.1 with a Final Offense Level of 31 and a Criminal History Category of I. Of those defendants, 99% received a

sentence of imprisonment (in whole or in part). The average length of imprisonment imposed was 81 months, and the median length of imprisonment was 84 months.[4] *See* United States Sentencing Commission, *JSIN database*, available at: https://jsin.ussc.gov/analytics/saw.dll? Dashboard (last accessed May 6, 2026).  While this reflects a slight downward variance from the Guidelines range, it also demonstrates the need for a meaningful term of imprisonment to avoid unwarranted disparities.  The United States respectfully submits that the aggravating aspects of this case, particularly the length of the scheme, the devastation caused to the victims, the invasiveness of meeting with S.H. in person, and the amount of money laundered by the Defendant warrant a Guidelines sentence here.

### III.    The Court Should Order Emesim to Pay $1,592,315 in Restitution

The Mandatory Victim Restitution Act (MVRA) requires full payment of restitution to victims. 18 U.S.C. § 3663A(a)(1) and (c)(1)(B); *see, e.g.*, *United States v. Roper*, 462 F.3d 336, 338 (4th Cir. 2006) ("This language clearly states that a restitution order imposed under the MVRA is mandatory."). "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A); *Roper*, 462 F.3d at 339 (noting that the MVRA removed a district court's discretion to order restitution for less than the full amount of the victim's loss, even

---

[4] This excludes defendants who received a §5K1.1 substantial assistance departure.

8

when a defendant lacked the ability to pay). And an order of restitution is part of each defendant's sentence. 18 U.S.C. § 3664(o).

Here, the United States has identified 25 victims that each suffered a loss as a result of Emesim's personal conduct, for which they are entitled to restitution. Each of these victims sent funds to Emesim, but many also sent money to others similarly situated to Emesim and part of the criminal enterprise.

The United States respectfully requests that the Court enter a restitution order consistent with the chart below:

| | Victim | Transferred to Emesim | Transferred to Others | Total |
|---|---|---|---|---|
| 1 | A.W. | $ 85,500.00 | $14,500.00 | $ 100,000.00 |
| 2 | A.R. | $ 6,100.00 | | $ 6,100.00 |
| 3 | B.T. | $ 5,000.00 | $ 7,000.00 | $ 12,000.00 |
| 4 | B.B. | $ 53,800.00 | $ 180,000.00 | $ 233,800.00 |
| 5 | B.E.[5] | $ 12,100.00 | $ 25,000.00 | $ 37,100.00 |
| 6 | C.B.[6] | $ 19,000.00 | | $ 19,000.00 |
| 7 | D.G. | $ 10,500.00 | | $ 10,500.00 |
| 8 | D.E./W.E. | $ 80,000.00 | $ 100,000.00 | $ 180,000.00 |
| 9 | E.H. | $ 30,000.00 | | $ 30,000.00 |
| 10 | F.C. | $ 8,550.00 | | $ 8,550.00 |
| 11 | G.S. | $ 2,500.00 | $ 127,500.00 | $ 130,000.00 |
| 12 | I.B. | $47,400.00 | | $ 47,400.00 |
| 13 | J.L. | $ 18,500.00 | $ 231,500.00 | $ 250,000.00 |
| 14 | L.R. | $ 15,100.00 | | $ 15,100.00 |
| 15 | M.N. | $ 20,000.00 | $ 6,700.00 | $ 26,700.00 |
| 16 | N.G. | $ 57,500.00 | | $ 57,500.00 |
| 17 | R.B. | $ 15,000.00 | | $ 15,000.00 |
| 18 | R.B. | $ 3,040.00 | | $ 3,040.00 |
| 19 | S.D. | $ 20,000.00 | $ 70,000.00 | $ 90,000.00 |
| 20 | S.F.O. | $ 81,500.00 | | $ 81,500.00 |
| 21 | S.H. | $ 10,500.00 | $ 92,255.00 | $ 102,755.00 |
| 22 | S.W. | $ 300.00 | | $ 300.00 |
| 23 | S.H. | $ 49,320.00 | | $ 49,320.00 |
| 24 | T.A. | $ 9,950.00 | | $ 9,950.00 |
| 25 | V.V.[7] | $ 76,700.00 | | $ 76,700.00 |
| | Total : | $ 737,860.00 | $ 854,445.00 | $ 1,592,315.00 |

In the course of interviewing these victims in preparation for trial, many victims

---

[5] B.E. declared only $35,000 in losses in her Declaration of Victim Losses, but the investigation revealed she sent approximately $37,100 to Emesim and other coconspirators.  The United States seeks $37,100 in restitution.

[6] C.B. declared only $14,000 in losses in her Declaration of Victim Losses from a single bank check, but she sent Emesim two transfers, including one additional wire to Emesim for $5,000 that should be included in the restitution figure.

[7] V.V. claims an additional $20,135.19 in losses, representing 6% for each year in lost business opportunities.  This is not compensable under the MVRA, so the United States is not seeking this addition to his restitution amount.

provided information about the amounts transferred to others as a result of the same scam that induced them to send money to the Defendant. Additionally, A.W., G.S., and J.L. claimed losses through their Victim Impact Statements/Victim Declarations of Loss in excess of what the United States had discovered had been sent to Emesim.[8] The Defendant should be held liable in restitution for victims' total losses, that is, the amounts sent to his accounts, as well as those sent to others as part of the same fraud and money laundering scheme. *See United States v. Bogart*, 576 F.3d 565, 576 (6th Cir. 2009) ("While Bogart argues that because his particular actions did not cause the victims' losses, he should not be held responsible for the restitution payment, this Court has rejected such an argument. . . . 'In the context of a conspiracy, it is clear that a defendant is liable in restitution to all the victims of the reasonably foreseeable acts of his co-conspirators. No court has ever held to the contrary.'") (citation omitted); *see also United States v. Bailey*, 973 F.3d 548, 575–76 (6th Cir. 2020) (recognizing propriety of "using conspiracy principles to determine a defendant's amount of restitution" extending to "the loss caused by the entire conspiracy" as contrasted with guidelines application for sentencing purposes).

## IV.    Update to Victim Statements

Since the United States filed its Notice Regarding Sentencing Hearing [R. 101: Notice], additional victims have expressed their desire to observe the sentencing hearing remotely, although none have asked to speak. Those additional victims are B.T., B.E.,

---

[8] These additionally declared losses were not part of the PSR's restitution calculation.

M.N., and S.H.  S.H.'s caregiver has also provided a victim impact statement that has been disseminated to the United States Probation Office.  The United States respectfully requests that the Court advise on options for remote viewing of the sentencing hearing, as well as offering live, remote statements during the sentencing hearing, for the victims who seek to exercise those rights under the MVRA.

### CONCLUSION

For the foregoing reasons, the United States asks the Court to impose a within-Guidelines sentence of 108 to 135 months and order Emesim to pay $1,592,315.00 in restitution.

Respectfully submitted,

JASON D. PARMAN
FIRST ASSISTANT UNITED STATES ATTORNEY

By:   */s/ Kathryn M. Dieruf*
      Kathryn M. Dieruf
      Assistant United States Attorney
      260 W. Vine Street, Suite 300
      Lexington, Kentucky 40507-1612
      (859) 685-4885
      Kathryn.Dieruf@usdoj.gov

12

**CERTIFICATE OF SERVICE**

On May 8, 2026, I electronically filed this document through the ECF system, which will send notice to counsel of record.

/s/ Kathryn M. Dieruf
Assistant United States Attorney

13